78  415
113  422

FREDERICA ABELE ET AL. v. SAMUEL MCGUIGAN,

AND

SAMUEL MCGUIGAN v. FREDERICA ABELE ET AL.

*Equity—Cotemporaneous instruments—Construction—Life-lease—Mortgage—Bona fide holder—Mortgage notes subject to equities before due, when—Foreclosure.*

1. The purchaser of several notes, and of the accompanying mortgage, *one* of which notes is then dishonored, is put upon inquiry as to *all* of the notes, and takes them subject to existing equities, the notes and mortgage being one transaction between the same parties.

2. In this case a father conveyed his farm to his son by an unconditional deed, and the son mortgaged the same to his father to secure $1,400, payable in eight annual payments of $175 each, and at the same time executed to his father and mother a lease of the premises at a nominal rental of one dollar, the object of which lease was declared to be to secure to the lessees $175 per annum for eight years, until the sum of $1,400 was paid. The lease also contained an agreement that the father and mother should have the use of the farm, and as a home for them, during their natural lives. The son went into possession and supported his father and mother on the premises until his death, when his father ejected his daughter-in-law, claiming the right to the exclusive possession of the farm, under said agreement, during his natural life; and it is held

that the instruments must all be construed together, and that the lease was intended as an additional security for the payment of the mortgage debt, and that the clause giving the parents the use of the farm during their lives was intended to insure to them a home on the farm while they lived. Questions of waste by the father, etc., are involved, and an examination of the opinion is essential to a full understanding of the case.

Appeal from Berrien. (O'Hara, J.) Argued October 24, 1889. Decided December 28, 1889.

Original bill to restrain foreclosure of mortgage, and for accounting of rents and profits had by mortgagee. Cross-bill for foreclosure of mortgage, etc. Original complainants appeal from decree for foreclosure. Amount found due by circuit judge reduced, and decree entered for such reduced amount. The facts are stated in the opinion.

*David E. Hinman* and *Edward Bacon,* for complainants in original suit.

*Lawrence E. Fyfe,* for defendants in original suit.

MORSE, J. In March, 1869, Jonathan Rose, now deceased, was the owner of 80 acres of land in the township of Benton and county of Berrien, in this State. On the 3d day of that month he and his wife, Amelia Rose (now dead), executed and delivered to William J. Rose a warranty deed, without any conditions in said deed. William J. Rose was a son of Jonathan and Amelia, the husband of the complainant Frederica Abele, and the father of the complainants Rose. On the same day, William J. Rose and his wife gave back to Jonathan a mortgage upon the land to secure eight notes for $175 each, with 7 per cent. interest, payable annually. Each year thereafter one of these notes became due. The last one became due March 3, 1877. At the same time

William J. and wife also executed to Jonathan and wife a life-lease, which provided that the first parties granted, demised, and farm let the said land to the parties of the second part "for and during the natural life of Jonathan Rose and Amelia Rose, his wife," the parties of the second part yielding and paying unto the parties of the first part the sum of one dollar, and the first parties to pay all taxes and assessments upon the property, and further providing as follows:

"Now, the object of this lease is to secure to the parties of the second part the payment of $175 per annum for eight years, until the sum of $1,400 has been paid. And it is also agreed between the said parties that the said Jonathan Rose and Amelia Rose shall have the use of the farm, and as a home for them, during their natural lives."

Immediately after the making of these papers, William J. Rose and family moved upon the farm, and William managed it as his own property, and supported his father and mother until he died, on March 21, 1871. Jonathan Rose then took the possession of the farm, as he claimed, under the life-lease, and ordered the widow of William from the premises, and she went. During this time some payments had been made on the mortgage, and some of the notes taken up. March 4, 1874, Jonathan Rose assigned the mortgage and the remaining notes to Samuel McGuigan. In that year McGuigan began a foreclosure, by advertisement, of this mortgage.

July 30, 1874, the complainants, Frederica Abele and the children of William J. Rose, filed a bill in chancery in the circuit court for the county of Berrien, against Samuel McGuigan and Jonathan Rose, to enjoin said foreclosure. This is the first suit, entitled as above. Jonathan Rose died in 1877, leaving McGuigan sole defendant. This action was still pending when, June 25,

1881, McGuigan filed his bill in chancery to foreclose the mortgage. September 15, 1888, he filed an amended bill in the same suit, making Silas S. Davis and his wife, Jane Davis, parties thereto; alleging that they were in possession of the premises; claiming some rights therein. This amendment was made by stipulation of the parties, and in the same stipulation it was agreed that McGuigan's bill, as amended, should be considered as a cross-bill in the first-entitled suit; and that the bill of complaint in that case should stand as the answer of the complainants in that cause to the cross-bill of said McGuigan; and that all claims and controversies between the parties should be finally ended and disposed of in the two suits as one suit; and that any competent court, in such suit, might decree affirmative relief to any party or parties entitled thereto.

Upon the pleadings, and under the proofs taken, the circuit court for the county of Berrien, in chancery, decreed, January 31, 1889, in favor of McGuigan. Said court found due upon the notes and mortgage the sum of $1,733, and decreed that the same be paid on or before May 1, 1889, together with the interest and costs, or the mortgaged premises be sold in the usual manner under foreclosures in chancery. The complainants appeal.

The claim of Mrs. Abele and the Rose children, in their bill of complaint and in the testimony of Mrs. Abele, was that at the time these papers were executed Jonathan and Amelia Rose were aged and infirm, and desired to have William J. Rose and his wife come and reside on this land, and take care of them; that Jonathan agreed that if they would do so he would execute a complete conveyance of the land to William, for which the latter should pay him $1,600,—$200 down, and $1,400 in eight equal annual payments,—it being also the intent and agreement that William should manage and carry on

the farm as his own; that said papers were executed in pursuance of such agreement, and the $200 was paid down; that the farm was worth over $3,000, but that it was so deeded for the price of $1,600 because Jonathan had formerly been possessed of more land and property, which he had given to his other children, while he had given William nothing before this time; that the lease was not intended to give Jonathan or his wife possession of the farm, and if, by its terms, it did so, it was a mistake; that the lease was intended for no other purpose than to secure the payment to them of $175 per year for eight years, and that it was intended that the full possession and use of the premises should vest in William J. and his heirs, and this was the understanding; that William J. Rose and family immediately moved upon the place, leaving a farm of his own in another township, and managed the farm, and took care of his father and mother, until his death; that it was supposed by all, until after his death, that he had the right to so use and control the farm.

About two weeks after his death, while the appraisers were there to inventory the property of William J. Rose, one of them called the attention of Jonathan Rose, his wife being then dead, to the peculiar phraseology of the life-lease as to the use of the farm. Until that time he had never made any claim to such use; but he then said that he should take control of the farm, and manage it while he lived. It is shown by the appraisers and others that he acknowledged the personal property, stock, and crops on the farm to be William's; and they were inventoried at first, and taken by the administratrix, his widow, as a part of his estate.

The bill of complaint alleges that the rental value of the farm when the writings were executed, and while William lived upon it, was worth more than $175 per

year. It is further alleged in the bill, and also shown by the proofs, that within a short time after the death of William, Frederica and her children were driven by orders and threats from the land by Jonathan, who ever after, while he lived, excluded them from all possession of, or any profits from, the same. It was further charged in the bill that after Jonathan took possession he committed waste upon the land; that there were 30 acres of valuable timber on the land when William died, which Jonathan sold or destroyed; that within the year preceding the filing of the bill he had caused to be cut and carried away more than 60,000 feet of valuable white wood timber; that such damage by waste exceeds $500; that Jonathan allowed fences to get out of repair, and land to run down, decreasing the same in value over $200. The bill claims that these damages should be set off against the notes, as well as the rent of the premises during the life of Jonathan Rose, and after the expulsion of complainants from the land. Avers that McGuigan is not a good-faith purchaser of the notes and mortgage. Prays an accounting with the defendants, Jonathan Rose and McGuigan, and that there may be set off against the unpaid notes and the mortgage any sums of money for which said Rose was accountable by reason of waste in cutting timber, or rent or use and occupation of the premises.

Jonathan Rose, though served with process and appearing in the case by counsel, never answered.

McGuigan, in his answer, admits the execution of the deed, mortgage, and life-lease, but asserts that the language of the lease asserts its true meaning. Denies that it was ever intended that William J. Rose, in the lifetime of Jonathan, should have the use and occupation of the premises. Denies that $200 was paid down when the papers were executed. Denies all the other material

allegations of the bill, and sets up the true agreement and facts as follows:

"That the said William J. Rose and his wife, Frederica, were poor, and without means, and the said Jonathan and Amelia were old; that the said William J. was anxious to make his home with the old folks, the said Jonathan and Amelia, and obtain, if possible, title to the farm then and for a long time prior thereto owned and occupied by them as a homestead, and which was then worth about three thousand dollars. That on or about the 3d day of March, A. D. 1869, the said William J. did, after repeated and persistent endeavor, and by soft murmurings of sweet nothings, induce his parents, the said Jonathan and Amelia, to enter into an agreement substantially as follows: That at the death of the said Jonathan and Amelia the said William J. should become entitled to, and should own, the said described premises; that in consideration thereof the said William J. should pay to said Jonathan the sum of $1,400, in eight equal annual payments, with interest at seven per cent. per annum, payable annually. And it was agreed that the said William J. and his wife, Frederica, should tend to and care for their aged parents, the said Jonathan and Amelia, during their natural lives, in a kind and loving manner. That thereupon the said deed, life-lease, and mortgage, and the notes evidencing the sum secured thereby, were drawn and delivered as before stated. That subsequently, in order better to carry out the agreement by which the said William J. and Frederica were to care for the old folks, as hereinbefore set forth, the said Jonathan rented the farm to the said William J., and allowed him, and his wife and family, to occupy the house thereon jointly with himself and wife, Amelia."

Denies that Frederica and her children were expelled from the premises by Jonathan, but avers that she deserted him and the place. Admits that at the time he purchased the notes and mortgage he had notice of the life-lease, but denies that he was informed or knew of any waste committed, or damage done the premises, by the taking of timber or otherwise. Avers that he has

been informed since that Jonathan did sell some timber, but that Frederica received the pay for the same, except a few dollars, and alleges that he bought said notes and mortgage in good faith, and for value.

At the hearing of the case, in January, 1889, the following further stipulation was made:

" All the testimony in the case shall be considered by the court, and all pleadings shall be deemed to have sufficient allegations to support the testimony."

I am satisfied that the intention of the parties in the execution of the deed, notes and mortgage, and life-lease was as claimed by the complainant, and that it was supposed by all the parties that the language of the lease conformed to such intention, until after the death of William J. Rose, and that the first idea that Jonathan Rose had that he could absolutely control and manage the farm under such lease was after his attention was called to the last clause of it by Mr. Vandevere, one of the appraisers of William's estate. William, while he lived, controlled and managed the farm as his own, with the consent of Jonathan. The claim that Jonathan rented it to William is not sustained by the evidence. The counsel for McGuigan claims that the fact that Frederica, as administratrix, inventoried only two-thirds of the growing crops as the property of the estate, bears testimony in favor of the rent theory; but this was done after Jonathan made up his mind to take advantage of the lease. The appraisers testify that while they were there he pointed out all the property as William's, and laid no claim to any of the growing crops.

The three instruments must be construed together; and in that light, and in view of the evident understanding of the parties, it must be held that the lease was intended as an additional security to the payment of the notes, and the last clause was intended simply to insure to

Jonathan and Amelia a home there on the farm while they lived. If the word "and" had been left out, it would, in my opinion, have correctly expressed the intention of the parties, thus:

"That the said Jonathan and Amelia shall have the use of the farm as a home for them during their natural lives."

If the object of the lease was, as stated in it, to secure the payment of $175 per annum for eight years, what purpose was the lease to serve after this money was paid? If under it Jonathan was to have the complete use, control, and management of the farm during his life, where was the security in it for the payment of this money? The terms of the lease, and the possession and control of the place, would be in Jonathan, whether the $175 per year for eight years was paid or not. And there was nothing in the lease that would prompt William to pay the money, or tend in any way to secure such payment to Jonathan, as, under the theory of the defendant, the lease would remain, and its operation and terms be, the same after payment as before. This lease is ambiguous and not easily explainable, as it stands. The intent of the parties cannot be certainly gathered from it. We are therefore authorized to go outside of it, for these reasons, and also because, standing alone, it is not the entire contract of the parties. We must go to the deed, the mortgage, and the other facts surrounding the transaction of the execution of the three instruments, and get the intent of the lease therefrom. And it is safe, as well as just, to take the intention of the parties as manifested by their acts at the time, and thereafter until William's death. Following this intent, we must hold that Jonathan had no right to take possession of one-third of the crops on the place when William died, or to expel Frederica and her children from the farm, which he did.

McGuigan cannot, in any event, be considered a *bona fide* holder of the mortgage. He admits in his answer that he knew of the life-lease, or had notice of it; and he could not well be ignorant of the fact that Jonathan was selling timber off from the place which he had no right to sell. He is not sworn in the case. But, whether he knew these things or not, one of the notes was dishonored, and had been for a year. Another became due, excluding days of grace, the day before he took the assignment of the mortgage. Jonathan Rose was sharp enough to prevail upon or otherwise induce Frederica to pay nearly all the money she could raise from the personal property of her husband upon the debt; and she had taken up the first three notes, and paid $25 on the fourth, November 18, 1871, in the fall after William's death. The notes that McGuigan bought fell due in 1873, 1874, 1875, 1876, 1877. He purchased them in 1874, March 4. The notes and mortgage were one transaction. He had notice from the face of them that the notes were all executed upon the same day, and the mortgage secured all of them. Buying them together, he could not be a good-faith holder of any of them. One of them being past due put him upon inquiry as to that note; and an inquiry as to the dishonored note would involve an investigation into all of them, being all one transaction, and all executed by one person to the same person. He not only took one, but all of them, subject to the equities between William J. Rose and his heirs and Jonathan Rose. This may account for the fact that he paid only $700 for them, when the assignment of the mortgage covenanted that there was "$940, and perhaps more," due upon it.

The decree of the court below gave to McGuigan the face of the notes, with interest. The following deductions should have been made: Fifty dollars, with interest

from March 4, 1874, money received by Jonathan Rose from the sale of timber to Higbee. The proofs show that Rose sold to Higbee at least about 63,000 feet of valuable timber. Through the efforts of the bondsmen of Frederica, as administratrix of her husband's estate, and the judge of probate, Higbee was induced to settle with her at $8 per 1,000 feet, less $50 that he had previously paid Jonathan, and $100, the estimated cost of cutting and hauling the logs. It is plain that the settlement with Higbee was an easy one for him, and that Frederica received no adequate compensation for the damage done to the estate by the cutting of timber. It is claimed by the counsel for the children that Frederica had no authority to settle with Higbee, and receive the money, and that they are entitled to set off the whole damage against the mortgage; but we shall allow the sum received by her to stand as a payment towards the damage. We think, however, that $150, besides the $50 paid to Rose, must be credited against the mortgage; in all, $200, for waste, with interest at 7 per cent. from March 4, 1874. There was further waste of the premises after the mortgage came into McGuigan's hands, by Jonathan, while he lived, and also by Silas Davis, his son-in-law, who took possession of the land after his death; but this we cannot reach in this proceeding, as it cannot be charged up against McGuigan. There must also be a credit of $50 from November 18, 1871, for one-third of crops wrongfully claimed and taken by Jonathan.

Jonathan, also had the use of the farm after William's death. The rental of the same was variously estimated from $175 to $240 yearly. Jonathan was entitled, probably, to his living thereon, as Frederica did not care for him, which was his own fault. We shall credit upon the mortgage $50 for three years, making $150 with interest at 7 per cent. from March 4, 1874. These deductions, as

I compute them, with interest until January 31, 1889, the date of the decree below, at 7 per cent., amount in all, principal and interest, to $825.55. This, deducted from the amount of the decree, $1,733, leaves $907.45.

A decree will be entered here in favor of said Samuel McGuigan for that amount, with interest at 7 per cent. from January 31, 1889, less the costs of both courts, in favor of complainants, to be taxed. The balance remaining after such costs are deducted to be paid on or before 60 days after the taxation of costs, or the premises to be sold to satisfy the same, in the usual manner of foreclosure sales.

The other Justices concurred.